## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| E.SPIRE COMMUNICATIONS, INC., *et al* ., | : | |
| | : | Case No. 01-0974 (LHK) |
| | : | Jointly Administered |
| Debtors. | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| GARY SEITZ, as Chapter 11 Trustee | : | Adv. Pro. No. 04-_____ |
| of E.SPIRE COMMUNICATIONS, INC., | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| SEAN SCARLIS, ANTHONY POMPLIANO, | : | |
| DAVID PIAZZA and BRADLEY SPARKS, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------x

Gary Seitz, as Trustee of e.spire Communications, Inc. ("E.spire," the "Company," or the "Debtor"), by his attorneys, as and for his complaint against Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks, alleges as follows:

### Introduction

1.     E.spire Communications, Inc. ("E.spire") was a telecommunications company that consistently reported losses from operations in its public filings. Over the eight year course of its existence, E.spire never once reported an operating profit; instead, at the end of each year it reported a net loss. Borrowing money in the form of loans from banks and investors represented the only method by which E.spire could remain in business. However, faced with the crucial importance of obtaining financing and faced with the uninviting and depressing true state of affairs within the Company, the named officer and director Defendants resorted to falsifying and inflating E.spire's financial reports. They engaged in this behavior

notwithstanding the fiduciary duties they owed to E.spire and its shareholders and notwithstanding the fiduciary duties they owed to E.spire's creditors in the zone of insolvency.

2.    Defendants Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks, during their tenure controlling the management of E.spire, engaged in a reckless and extraordinary squandering of corporate assets by their grossly negligent or reckless corporate behavior. These defendants were unable to control or institute basic corporate systems to prepare billings, pay vendors and retain employees. Faced with the burgeoning chaos within their ranks and forced to rely upon outside funding for their lifeline, they chose to manipulate and falsify the Company's financial reporting which they provided to its creditors, its shareholders and the public. Then, in order to hide this malfeasance from discovery, Sean Scarlis set out to hide, suppress and, as it appears, to ultimately destroy the evidence of the wrongdoing.

3.    For these reasons, Plaintiff Gary Seitz, duly appointed Chapter 11 Trustee (the "Trustee") of the Debtor's estate, seeks to recover damages on behalf of the Debtor and the Debtor's estate exceeding $100 million arising from numerous breaches by the director and officer defendants of their fiduciary duties of care, loyalty and good faith as directors and/or officers of the Debtor, and for acts of fraud in violation of the statutory and common law obligations to the Debtor, its shareholders and its creditors as set forth in detail below.

## Jurisdiction and Venue

4.    On March 22, 2001 (the "Petition Date"), E.spire filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court.

5.    On March 21, 2003, Gary Seitz, Esq. was appointed as the Chapter 11 Trustee pursuant to section 1104 of the Bankruptcy Code.

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and principles of pendent jurisdiction.

7.    Venue of the Chapter 11 case and this matter in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409, respectively.

8.    This is a "core" proceeding within the meaning of 28 U.S.C. § 157 (b)(2)(A), (B) and (O).

## The Trustee's Standing

9.    The Trustee is legally empowered to sue for damages to the Debtor and the Debtor's estate resulting from defendants' fraud, negligence, dishonesty, self-dealing and breach of fiduciary duties.

## The Parties

### The Plaintiff

10.    As stated above, the Trustee was appointed by order dated March 21, 2003.  The Trustee brings this action on behalf of the Debtor, the Debtor's estate, its creditors and shareholders.

### The Defendants

11.    Defendant Anthony Pompliano ("Pompliano") served as Chairman of the Board of E.spire from its inception until March 2000.  Pompliano also served as the Chief Executive Officer from August 1993 until October 1995, and then from November 1998 until March 2000.  At all times relevant hereto, Pompliano had the senior most responsibility for management of the Company, and direct oversight over the financial officers of the Company,

3

including defendants Piazza, Sparks and Scarlis, who reported to him. Pompliano currently resides in Longboat Key, Florida.

12.    Defendant David Piazza ("Piazza") served as the Chief Financial Officer of E.spire from March 1997 until October 1999. At all times relevant hereto, Piazza was the Company's senior financial officer, and had responsibility for accurately reporting and maintaining the Company's financial data and books and records. Piazza currently resides in Herndon, Virginia.

13.    Defendant Bradley Sparks ("Sparks") served as the Chief Financial Officer of E.spire from April 2000 until sometime after November 14, 2001. During that time period, Sparks was the Company's senior financial officer, and had responsibility for accurately reporting and maintaining the Company's financial data and books and records. Sparks currently resides in Seattle, Washington.

14.    Defendant Sean Scarlis ("Scarlis") joined the Company in August 1997 as Manager of Financial Reporting and was promoted to Assistant Controller and Director in September 1998. In November 1999, he became the Acting Controller. During his tenure as Acting Controller, between November 1999 and April 2000, Scarlis was primarily responsible for all of E.spire's financial reporting because E.spire lacked a permanent CFO. Scarlis then served as the Vice President, Controller and Chief Accounting Officer of E.spire from April 2000 until sometime in the spring of 2002. Thereafter, Scarlis became the Chief Financial Officer, a position in which he served through November 2003. Even after departing, Scarlis continued to be employed by the Trustee in a consulting capacity until April 2004, when his attempts to suppress the Company's records from the Trustee came to light. At all relevant

4

times hereto, Scarlis participated in preparing and maintained the Company's financial records, and specifically the records identified below. Scarlis currently resides in Columbia, Maryland.

### FACTUAL ALLEGATIONS

#### A.

#### THE DEBTOR'S BUSINESS

15.     The Debtor's principal corporate office was in Annapolis Junction, Maryland. Although on February 24, 2000, the Debtor officially announced the move of its corporate headquarters to Herndon, Virginia, in fact, a substantial number of the Debtor's personnel and administrative functions, including those complained of herein, remained in Maryland. The Debtor is incorporated in Delaware.

16.     E.Spire was formed in 1993 as American Communications Services, Inc. ("ACSI") and was designed to compete with local telephone companies by constructing its own fiber optic cables. ACSI originally had its headquarters in Chicago, Illinois, but moved to Annapolis Junction, Maryland in May of 1995.

17.     With the passage of the Federal Telecommunications Act of 1996, the restrictions preventing competition against the local telephone monopolies were lifted and ACSI evolved into a competitive local exchange carrier ("CLEC") providing local and long distance phone, high speed data and internet services to businesses primarily in the South and Midwest. By integrating these varied services and competing against the old telephone monopolies, ACSI sought to distinguish itself by serving as its business customers' single source of integrated communications services. In April of 1998, ACSI changed its name to E.spire.

18.     Every year, E.spire showed a net loss. Therefore, in order to encourage lenders and investors to invest in the Company, E.spire, like other Companies in the

telecommunications industry at that time, held out its reported revenues as an indicator of future profitability. In other words, E.spire, along with the other companies in the telecommunications industry, was evaluated based upon its reported revenues rather than its reported earnings.

19.    E.spire sought out three principle sources of revenue. Its core business consisted of enrolling customers for its integrated communications services. It also provided web hosting services through its wholly owned subsidiary CyberGate, Inc. ("Cybergate"), purchased in January 1997, and based in Deerfield Beach and Fort Lauderdale, Florida. Lastly, it aggressively constructed and designed fiber networks through its wholly owned subsidiary ACSI Network Technologies, Inc. ("ACSI NT"), launched in June 1998 and operated out of Atlanta, Georgia.

20.    For the most part, ACSI NT operated separately and independently from E.spire headquarters. However, E.spire tightly controlled ACSI NT's financial reporting. Before ACSI NT could enter into or book its contracts, it needed to submit them to E.spire's Legal and Financial Departments for final approval. According to E.spire's employees, E.spire's outside auditors, KPMG Peat Marwick LLP ("KPMG"), also reviewed many of the contracts prior to their recording by E.spire.

21.    For the reasons discussed below, as E.spire grew increasingly unable to derive revenue from its core business of providing telecommunications services, ACSI NT became increasingly important to the company's growth plans. By 2000, or in little less than two years, ACSI NT alone accounted for 24% of E.spire's total revenue.

22.    On March 22, 2001, E.spire filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware.

23.    By order dated June 12, 2001, this Court approved a DIP Loan and Security Agreement with Foothill Capital Corporation and certain other lenders, providing for a $25 million term loan with a $60 million revolver to the Debtor.  As of that date, the Debtor continued to insist that its revenues, particularly in the network technologies service arena, were generating substantial total gross margins, thereby inflating the value of its underlying assets and falsely serving as a harbinger of eventual profitability.

**B.**

**EVENTS LEADING UP TO THE CLAIMS**

24.    As far back as November 30, 1996, KPMG warned in its management letter relating to E.spire's June 30, 1996 audit, that E.spire had significant deficiencies with its internal controls, systems and staffing resources.  E.spire understood that such deficiencies could adversely affect its ability to report financial data consistent with management's assertions in public financial statements.  KPMG further discussed with the Debtor, at a March 1997 Audit Committee Meeting, that it had significant issues with its billing system and, consequently, its ability to record revenue and related accounts receivable.  Defendant officers and directors were painfully aware of the significant problems with E.spire's ability to accurately keep track of its basic business functions.

25.    Despite KPMG's direct warnings to the Defendant officers of the need to correct their basic and essential business operations, the Defendant officers failed to institute proper internal control systems.  By the end of the tenure of Defendants Piazza and Pompliano, in the fall of 1999 and winter of 2000, respectively, E.spire's basic internal control system had deteriorated to the point where E.spire could not properly bill its customers and derive revenue for the use of its network and data services, had no ability to accurately track payables or timely

pay the same and was generally in a state of perpetual administrative and financial reporting chaos.

26.     Thus, by early 2000, E.spire was properly billing only two-thirds of its customers; its billing department was spending up to 50% of its time just trying to get its invoices paid.

27.     The same circumstances existed with respect to E.spire's payable systems. As admitted in a confidential March 2000 memo to the Board:  "Words can not explain how bad this situation has become and at the end of March it is going to get much worse...  unless we get a ready made Telecommunications Finance Group immediately, the 'wheels will fall off' here at E.spire… We are now losing critical vendors every day due to non-payment.  Soon the ILEC are going to cut off E.spire's access.  This is urgent beyond words!"

28.     The March 2000 memo only summarized, albeit it in alarming tones, what had been known to management and the defendants for at least the prior 3 years.  During the tenure of Defendants Piazza and Pompliano, internal company documents indicated that the Debtor had no system in place for cataloging orders and paying its vendors.  Most of its vendors were not paid on time simply because E.spire could not determine who it owed money to and when.

29.     The administrative chaos at the Company, including its inability to gage either its payables or receivables accurately, was not lost on its employees, many of whom seized every opportunity to find other work.  Thus, compounding its problems, the Company experienced a tremendously high turnover of employees.  In Defendant Pompliano's own words in November, 1999, saved for an internal memo:  "We are experiencing a horrendous problem with [employee] churn, in virtually every area of the company.  Our churn rate now exceeds 6%

per month, and annualized is over 70%. That is worth repeating, a churn rate of over 70% is not

only disruptive, as you can imagine, it is incredibly expensive to hire and retrain such a huge

replacement number."

      30.    These deficiencies were further exacerbated by the Company's expensive,

and ill-planned and poorly executed "move" between late 1999 and early 2000. In fact, the

original plan, to move all employees from its Maryland location to its new Virginia facilities was

never consummated. A large portion of the employees remained behind, with no particular

rhyme or reason for how the undertaking was executed, creating further administrative chaos by

the fact that the administration of the Company had two separate sites, no logical demarcation

between who moved and who did not, poor communications between the offices, and an

additional aspect to manage when its resources were incapable of reigning in the chaos that had

existed before.

      31.    Yet at the same time as the Debtor's management was failing to address

the Debtor's basic inability to operate, and instead making it worse, Defendant Pompliano was

issuing public statements touting the financial condition of the Company in order to induce

lenders and vendors to continue doing business with the Company. For each of the 1999 interim

quarters, the Defendant officers released statements lauding the financial statements of the

Debtor:

          May 6, 1999 Press Release:       "Anthony J. Pompliano, Chairman and
          Chief Executive Officer states: 'We are very pleased that our quarter results have
          put us back on track for renewed delivery of steadily improving operational and
          financial performance… [i]n recent months the direction of our initiatives has
          been clear, and our current results underscore their effectiveness.'"

          August 12, 1999 Press Release:      "In its second consecutive quarter of strong
          fundamental improvement since refocusing its strategy in late 1998, the Company
          delivered sequential gain in core telecommunications revenue, complemented by
          an additional $18.6 million from its Network Technologies group."

October 28, 1999 Press Release:    "These results speak well of our sales efforts, but more importantly, they clearly demonstrate the improved capabilities of our back office systems."

32.    In order to compensate for their inability to profitably manage the Company, the Officer Defendants resorted to falsifying their reporting of revenue and costs, thereby, concealing or misrepresenting their inability to manage the Company, bill and pay financial obligations and maintain accurate financial records.

33.    During this time period, the need to demonstrate strong gains in revenue was particularly acute at E.spire. During all of the relevant periods herein, E.spire was an insolvent corporation. In fact, E.spire had never been profitable. For every year that it was in existence, E.spire showed a net loss. The only way that E.spire could survive was by inducing investors to invest in the Company, borrowing additional funds from lending institutions and forestalling creditors from demanding immediate payment of outstanding payables. However, the only way E.spire could obtain such funding was by inflating its revenue streams.

34.    Thus, these Defendants set off on a course of action whereby they would compensate for their own negligent corporate activity by defrauding not just the Company's shareholders, but the Company's creditors as well. They did this so as to hide their own malfeasance, to preserve their corporate positions and control over the Company and to personally benefit from the Company's increasing stock price predicated on the "growing" revenues which were illusory, at best. Thus, Pompliano continued to exercise and cash in stock options, thereby reaping huge cash gains. He received $2.1 million in 1999 and $3.9 million in 2000 from his options alone.

35.    As mentioned above, E.spire relied more and more heavily on the potential growth of its subsidiary ACSI NT (referred to as the Network Technologies Group in

the August 12, 1999 press release) to inflate its results.  Because of their inability to reasonably operate the other revenue streams, the Defendant officers manipulated the revenues reported by ACSI NT in order to cover for their own glaring failures.

36.     ACSI NT would report its revenue earned from its construction and leasing operations to Defendant Scarlis, the Chief Accounting Officer, who, while under the supervision of Defendants Piazza and Sparks, altered the ACSI NT numbers in order to hide the Company's overall abysmal operating performance.  They did this so that the Company's shareholders, creditors, and future lenders would not know the true financial condition of E.spire.

37.     A material portion of financial misstatements are attributable to those actually recorded on ACSI NT, allegedly a very profitable segment of E.spire's business with supposedly  high gross margins and significant potential to lead the Company to future profitability.

38.     Thus, in 1998, E.spire reported a network technologies service (i.e., ACSI NT) gross margin increase of $18.2 million, or 742%, to $20.7 million, on revenues of $29.4 million based on the sale of new high margin construction projects.  Even after adjusting for having improperly recognized revenues on certain long term lease and line usage payments as immediate revenue which should have been deferred, the Company continued to claim a 70.7% gross profit margin in this segment of its business.

39.     In 1999, E.spire reported total revenues of $68.3 million from ACSI NT and a gross margin of 34.7% down 36% from 1998, but still grossly inflated.

40.     In 2000, E.spire reported total revenue from ACSI NT of $82.8 million and gross margin of 44%.

11

41.     The gross profit margins for these three years were materially false and misleading in that they were grossly overstated.

42.     For example, in 1998 E.spire entered into a swap (barter) agreement with AT&T whereby E.spire traded its own fiber line for a comparable AT&T line, for a 25 year term. These long term leases were known in the industry as Indefeasible Rights of Use ("IRUs").  In connection with that deal, E.spire and AT&T exchanged identical amounts of cash resulting in no net cash gain to E.spire.  Nonetheless, E.spire unjustifiably and improperly recognized $9.5 million in "revenue" associated with this transaction in 1998.  The improperly recognized revenue from this transaction in the amount of $9.5 million constituted fully one third of ACSI NT's 1998 revenues.

43.     Again, in 1998, E.spire entered into a long-term swap agreement with Qwest Communications ("Qwest"), for which it unjustifiably and improperly recognized $3.5 million in revenue in 1998 and $13.9 million in 1999.  As in the AT&T transaction, E.spire and Qwest also exchanged identical amounts of cash resulting in no net cash gain to E.spire.

44.     In 1999, E.spire entered into yet another swap agreement with Qwest, for which it recognized $1.1 million in revenue.  Again, exactly equal amounts of cash were exchanged.

45.     The $15 million from these two Qwest swap transactions alone, which E.spire unjustifiably and improperly recognized as revenue, constituted 22% of ASCI NT's reported 1999 revenue.

46.     Furthermore, because of an accounting pronouncement, FIN 43, issued in 1999, E.spire was forced to recognize a "cumulative effect adjustment" of approximately $19 million as of December 31, 1999, in accordance with Accounting Principles Board Opinion No.

20, thus drastically reducing 1999 revenues.  In order to compensate for this reduction in

revenues, Defendants resorted to improperly booking 1st quarter 2000 contracts as 4th quarter

1999 revenue.  Further compounding the fraud, when the remaining 1st quarter 2000 revenue was

too low, they simply artificially inflated revenue from Reciprocal Compensation Agreements

("RCAs"), which were controversial arrangements whereby E.spire would charge other ILECs

for their traffic on E.spire's systems.  Thus, E.spire recognized $6 million of revenues from

RCAs, in the fourth quarter of 1999, part of which was actually attributable to the first quarter of

2000, then inflated the number to $15 million of RCA revenue, an increase of 250%, in the first

quarter of 2000.

47.    The overstatement of revenue resulting from these improperly recorded

transactions caused E.spire's financial statements to be false and misleading by materially

inflating the Company's revenue and understating the Company's expenses.

48.    E.spire also appears to have followed an industry wide practice of

improperly capitalizing period costs and expenses so as to understate reported expenses.  As set

forth in detail below, even though repeatedly asked by representatives of the Trustee for the

documentation to support the evaluation of the exchanged or swapped assets and the supporting

documentation for capitalization of expenses, defendant Scarlis, to whom the records were

entrusted, refused to provide the requested information or documentation.  As explained below,

Scarlis appears to have hidden or destroyed those records.

49.    E.spire's 2000 10-K, in which many of the above described misstatements

were reported, and on which the DIP lenders relied to their material detriment, was signed by

Defendants Scarlis and Sparks.

13

## VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP")

50.     GAAP is recognized by the accounting profession as the uniform principles, rules, conventions and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Statement of Financial Accounting Concepts No. 1 ("CON 1"), *Objectives of Financial Reporting by Business Enterprises*, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Specifically, par. 42 of CON 1 states:

> Financial reporting should provide information about an enterprise's
> financial performance during a period.  Investors and creditors often use
> information about the past to help in assessing the prospects of an
> enterprise.  Thus, although investment and credit decisions reflect
> investors' and creditors' expectations about future enterprise performance,
> those expectations are commonly based at least partly on evaluations of
> past enterprise performance.

51.     Furthermore, in preparing financial statements, management must take into consideration the fundamental objectives and concepts upon which GAAP are based, such as:

i.      The principle that financial reporting should provide information that is
        useful to present and potential investors and creditors in making rational
        investment decisions and that information should be comprehensible to
        those who have a reasonable understanding of business and economic
        activities.  (CON 1, par. 34);

ii.     The principle of materiality, which provides that the omission or
        misstatement of an item in financial statements is material if, in light of
        the surrounding circumstances, the magnitude of the item is such that it is
        probable that the judgment of a reasonable person relying upon the report
        would have been changed or influenced by the inclusion or correction of
        the item.  (CON 2, par. 32);

iii.    The principle that financial reporting should provide information about
        how management of an enterprise has discharged its stewardship
        responsibility to owners (stockholders) for the use of enterprise resources

14

entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (CON 1, par. 50);

iv.     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.  (CON 1, par. 42);

v.      The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (CON 2, par. 58-59);

vi.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (CON 2, par. 80); and,

vii.    The principle of conservatism is used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (CON 2, par. 95, 97).

52.     CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, establishes the conceptual framework for revenue recognition.  Statements of Financial Accounting Standards ("SFAS") establish GAAP for (a) specific types of transactions, for example, SFAS 13, *Accounting for Leases*, or SFAS 66, *Accounting for Sales of Real Estate* and (b) specific industries, for example, SFAS 51, *Financial Reporting by Cable Television Companies* and SFAS 50, *Financial Reporting in the Record and Music Industry*. Par. 83(b) of CON 5 states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities … and revenues are considered to be earned when the entity has substantially accomplished what it must do to be entitled to the

benefits represented by the revenues." Furthermore, par. 84(a) states that revenues are realized and earned "by the time the product or merchandise is delivered or the services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale…" Finally, par. 84(d) states: "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent)… revenues may be recognized as earned as time passes." In the telecommunications industry, the "sale" of capacity is analogous to license agreements in the record and music industry and, more recently, in the Internet industry, under which a substantial portion, if not all, of the revenue is recognized at the time of execution of the agreement. SFAS 50, *Financial Reporting in the Record and Music Industry*, states:

> Substantial revenues may be realized by the owner … by entering into license agreements. A license agreement may be, in substance, an outright sale. If the licensor has signed a noncancellable contact, has agreed to a fixed fee, has delivered the rights to the licensee who is free to exercise them, and has no remaining significant obligations to furnish [additional services], the earnings process is complete and the licensing fee shall be reported as revenue if collectibility of the full fee is reasonable assured.

In summary, revenue generally is realized or realizable and earned in conformity with GAAP when all of the following criteria are met:

- Persuasive evidence of an arrangement exits,
- Delivery has occurred or services have been rendered,
- The seller's price to the buyer is fixed or determinable, and
- Collectibility is reasonably assured.

The issuance of FIN 43 (Financial Accounting Standards Board Interpretation No. 43), an interpretation of SFAS 66, *Accounting for Sales of Real Estate*, led many telecoms (at the urging of their auditors) to change their methods of accounting for capacity "sales" as "operating type" leases as opposed to their previous accounting as "sales type" leases. In other words, revenue

should be reported over the term of the lease rather than immediately at the time of execution of the contract.

53.     As noted above, revenue recognition is appropriate upon consummation of a transaction when such revenue is both realized and earned.  In the case of a sale of an asset for cash, with no further obligations on the part of the seller, the "culmination of the earnings process" seems fairly clear.  In the case of a "sale" in which the seller retains future obligations under the contract, or where the receipt of the full amount of the "sale" is in doubt, the culmination of the earnings process is somewhat less clear.  The determination of the "culmination of the earnings process" is further complicated when a form of *quid pro quo* exists, as in the case of an exchange of similar non-monetary assets such as IRUs.

54.     The principal accounting guidance with respect to exchanges of nonmonetary assets is contained in Accounting Principles Board Opinion No. 29, *Accounting for Nonmonetary Transactions* ("APB 29").  Under the basic principle of APB 29, "nonmonetary transactions should be based on the fair values of the assets (or services) involved."  In other words, the "cost of a nonmonetary asset acquired in exchange for another nonmonetary asset is the fair value of the asset surrendered to obtain it, and a gain or loss should be recognized on the exchange."  On the other hand, the "fair value of the asset received should be used to measure the cost if it is more clearly evident than the fair value of the asset surrendered."  Consequently, a transaction involving an arms-length exchange of nonmonetary assets should generally produce the same result as a sale of an asset when a monetary asset is to be received (i.e., gain or loss is recognized).  However, par. 21 of APB 29 describes an exception to the basic principle:

> If an exchange is not essentially the culmination of an earning process, accounting for an exchange of a nonmonetary asset between an enterprise and another entity should be based on the recorded amount (after reduction, if appropriate, for an indicated impairment of value) of the nonmonetary asset relinquished.  The Board

17

believes that the following two types of nonmonetary exchange transactions do not culminate an earning process:

> a.  An exchange of a product or property held for sale in the ordinary course of business for a product to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, and
>
> b.  An exchange of a productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset.

55.    Accordingly, transactions meeting either of the aforementioned criteria would be based on the recorded "historical cost" amounts.  Consequently, in the case of IRUs, which may have no recorded values, an equal exchange of such assets would result in no accounting recognition of gain or loss in the financial statements of the seller.

56.    APB 22, *Disclosure of Accounting Policies*, requires an enterprise to provide disclosures that "encompass important judgments as to the appropriateness of principles relating to revenue recognition…"  Accordingly, because revenue recognition generally involves some level of judgment, the company's revenue recognition policy should usually be disclosed. More importantly, if a company has different policies for different types of revenue transactions, the policy should be disclosed for each material revenue source.

57.    E.spire's financial statements and accompanying disclosures contained in the Company's annual reports and SEC filings violated GAAP because, among other things, they:  (1) overstated revenue by improperly recognizing revenue on swap transactions and RCAs, (2) overstated accounts receivable related to RCAs, and (3) overstated assets and understated expenses by improperly capitalizing or deferring period costs and operating expenses.

18

## 1) Overstated Revenue

58.    Clear and longstanding GAAP precludes the recognition of revenue and the recording of related accounts receivable from transactions that have no economic substance. As stated above, the basis for revenue recognition is contained in CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*. Specifically, par. 83 states that recognition of revenue depends upon revenue (a) being realized or realizable and (b) being earned.

59.    In addition, par. 83 states:

> Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

Par. 84 (a) further states that "revenues from manufacturing and selling activities are, in the absence of facts and circumstances to the contrary, commonly recognized at the time of sale, *usually meaning delivery*."

60.    In December 1999, the SEC released Staff Accounting Bulletin ("SAB") 101. SAB 101 addresses a number of revenue recognition issues and makes specific reference to a number of accounting literature sources, including, but not limited to, CON 5. SAB 101 listed the following criteria for revenue recognition:

1. The risks of ownership must have passed to the buyer;

2. The customer must have made a fixed commitment to purchase the goods, preferably reflected in written documentation;

3. The buyer, not the seller, must request that the transaction be on a bill and hold basis. The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

4. There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);

5. The seller must not have retained any specific performance obligations such that the earning process is not complete;

6. The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7. The equipment must be complete and ready for shipment.

61.     Thus, it is quite clear that both GAAP and SEC Regulations have consistently established a very high "threshold" for recognition of revenue under swap transactions and RCAs. Based on the Debtor's available records, E.spire failed to meet even the most basic criteria for revenue recognition required by CON 5 and APB 29. Consequently, the improper recognition of revenue on swap transactions and RCA's resulted in the material overstatement of revenue, assets and EBITDA during the relevant period.

62.     First of all, these Defendants improperly immediately recognized as revenue the *entire* value of IRU sales from long term leases while amortizing the costs of the "acquired asset" over the terms of the leases. Even prior to the issuance of FIN 43, this was improper under SFAS 13, *Accounting for Leases*, and materially misrepresented E.spire's revenues and the value of E.spire's assets.

63.     Furthermore, these Defendants improperly inflated E.spire's revenues by improperly accounting for transactions with other telecommunications companies. In the swap transactions noted previously, E.spire sold capacity on its network to telecommunication companies who then bought capacity back. On these swaps, E.spire recognized the revenue from the capacity sold up front, but recorded the cost from the capacity purchased as a capital asset

rather than recognizing the cost immediately as an operating expense. In some cases, E.spire failed to disclose that these exchanges were really reciprocal exchanges of similar assets.

64.    By engaging in the aforementioned reciprocal IRU sales with these other telecommunications companies, discussed above, and basically swapping network capacity, E.spire artificially inflated its revenue and violated GAAP by recognizing any revenue on these transactions because, under APB No. 29, E.spire should have accounted for these exchanges using its historical or cost basis of the capacity relinquished in the transactions.

**2) Overstated Accounts Receivable**

65.    E.spire's receivables failed to meet the GAAP requirement for current assets as provided by AICPA Accounting Research Bulletin 43 ("ARB 43"), *Restatement and Revision of Accounting Research Bulletins*, Chapter 3: *Working Capital, Section A – Current Assets and Current Liabilities,* par. 4. According to these GAAP provisions:

> [T]he term current assets is used to designate cash and other assets or resources commonly identified as those which are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business… Thus the term comprehends in general such resources as … trade accounts, notes, and acceptances receivable … if collectible in the ordinary course of business within a year…

66.    Additionally, GAAP requires that receivables be reported at net realizable value, that is, the amount expected to be collected as follows:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 of SFAS 5 [*Accounting for Contingencies*] are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. (ARB 43).

67.    Once again, the Debtor's available books and records indicate that E.spire did not record sufficient allowances for doubtful RCA receivables and, therefore, failed to comply with GAAP.

**3)  Improper Capitalization or Deferral of Period Costs and Expenses**

68.    In an attempt to increase income, E.spire improperly capitalized or deferred a broad range of period costs and operating expenses.

69.    CON 5 describes the recognition of an item (or transaction) in the financial statements as "the process of formally recording or incorporating [such] item in the financial statements of an entity as an asset, liability, revenue, expense, or the like.  Recognition includes depiction of an item in both words and numbers, with the amount included in the totals of the financial statements.  For an asset or liability, recognition involves recording not only acquisition or incurrence of the item but also later changes in it, including changes that result in removal from the financial statements."  (CON 5, par. 6).

70.    CON 5 further states that an "item and information about it should meet four fundamental recognition criteria to be recognized and should be recognized when [those] criteria are met …."  Among those criteria is reliability, which embodies the concept that "information about an item must be representationally faithful, verifiable and neutral.  To be reliable, information must be sufficiently faithful in its representation of the underlying resource, obligation, or effect of events and sufficiently free of error and bias to be useful to investors, creditors, and others in making decisions.  To be recognized, information about the existence and amount of an asset, liability, or change therein must be reliable."  Furthermore, an item to be recognized in the financial statements as a resource must meet the definition of an asset.  (CON 5, pars. 63 and 75).

71.    With respect to expenses and losses CON 5 states:

… Recognition of expenses and losses is intended to recognize consumption (using up) of economic benefits or occurrence or discovery of loss of future economic benefits during the period. Expenses and losses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations or when previously recognized assets are expected to provide reduced or no further benefits. (CON 5, par. 85)

… Consumption of economic benefits during a period may be recognized either directly or by relating it to revenues recognized during the period. (CON 5, par. 86).

.. An expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits. (CON 5, par. 87).

72.    As discussed below, Defendant Scarlis has refused to turn over the records, from which it could be determined how costs were capitalized, notwithstanding the fact that these records were entrusted to him. In addition, Company personnel have told the Trustee's representatives that the Company's capitalization policy, which would be apparent from the missing financial records, was suspect. Therefore, based on the limited information actually provided to the Trustee, it appears that E.spire failed to comply with GAAP, as set forth in CON 5, by improperly capitalizing or deferring period costs and operating expenses.

4)    **Improper Maintaining of Financial Records**

73.    According to SAB 99, *Materiality*, all registrants of securities must comply with § 13 (B)(2)-(7) of the Securities Exchange Act of 1934. To this end, all registrants must "make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in

conformity with GAAP." Importantly, "[i]n this context determinations of what constitutes 'reasonable assurance' and 'reasonable detail' are not based on a 'materiality analysis but on the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs."

74. The Defendant officers of E.spire violated SEC regulations by failing to maintain adequate records and internal accounting controls pursuant to SAB 99.

## DEFENDANTS' EFFORTS TO CONCEAL THE FRAUD

75. In September 2003, representatives of the Trustee met with Sean Scarlis, then acting CFO of E.spire to investigate E.spire's recording and reporting of financial data. At that meeting, Scarlis represented that E.spire had never engaged in any swap transactions (discussed above). Scarlis further represented that all of E.spire's relevant financial information was stored with the Company's records at a warehouse facility in Landover, Maryland (the "Warehouse"), where over 1000 boxes of E.spire's documents were stored. Both of these representations were false. And both were designed to derail the Trustee's investigation.

76. The truth was that E.spire did engage in swap transactions. As Manager of Financial Reporting, Assistant Controller and Chief Accounting Officer of E.spire, Scarlis knew that this was blatantly false. Furthermore, Scarlis lied about the whereabouts of E.spire's financial records. Those records were not at the Warehouse; they were in his possession, located among other places, on his home computer and deliberately withheld from the Trustee.

77. In December 2003, after failing to locate key E.spire financial records at the Warehouse, representatives of the Trustee once again returned to Scarlis. They again stated they were searching for the Company's General Ledger and the consolidating financial statements and supporting documents. Once again, Scarlis stated he believed these documents

were located at the Warehouse, knowing this to be false. Once again, based on Scarlis' false statements, which the Trustee's representatives had no reason to suspect, the Trustee's representatives returned to the Warehouse and conducted a second search.

78.    In February 2004, representatives of the Trustee returned to Scarlis seeking the documents for which Scarlis had been responsible at E.spire. This time Scarlis maintained that the relevant documents might be maintained by ACSI NT in Atlanta, Georgia. Scarlis falsely explained that ACSI NT had effectively operated its financial reporting independently of E.spire headquarters and, therefore, could still be in possession of the documents. Both of these assertions were false. Both were deliberately designed to mislead the Trustee.

79.    In March 2004, representatives of the Trustee visited ACSI NT, where they learned that Scarlis had been intimately involved in the compilation of ACSI NT revenue reporting. Scarlis personally reviewed and modified all the financial reports sent from ACSI NT. Scarlis was known to have made changes to the financial reports without consulting ACSI NT personnel. Furthermore, ACSI NT did not have access to E.spire's general ledger, consolidating financial statements or journal entries. The materials were all maintained at E.spire Headquarters by Scarlis.

80.    Finally, in March 2004, the Trustee requested that Scarlis meet with the Trustee's accountants at E.spire's computer server to identify and produce all of the financial data which Scarlis had, after all, been responsible for maintaining. Scarlis refused.

81.    Instead, the Trustee's accountant went to the E.spire server with Nicole Rosenthal ("Rosenthal"), Scarlis' principal assistant at E.spire, who was no longer engaged by

the Company. However, the computer file labeled "Revenue," which, according to Rosenthal, had previously contained details supporting revenue transactions was now empty.

82.    In addition, Rosenthal reported that details supporting all journal entries were maintained in "Journal Entry Binders", which she "boxed up" for storage prior to her leaving the company, entrusting them to Scarlis. The binders containing these entries are currently missing despite repeated requests to Scarlis that he either produce them or reveal their location to the Trustee.

83.    Defendants Pompliano, Sparks, Piazza and Scarlis had a duty to safely maintain these financial documents.

## THE CLAIMS

### FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty of Care against Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks**

84.    The Trustee repeats and incorporates by reference the allegations contained in the preceding paragraphs as if set forth herein.

85.    These Defendants breached their fiduciary duty of care owed to E.spire to exercise and to discharge their duties in a reasonable and prudent manner. By failing to institute basic internal controls, by failing to oversee basic business operations such as billing customers, by failing to keep accounting records in a prudent or organized manner and by allowing the Company to operate in freefalling chaos, these officers/ directors failed to discharge their executive duties in a reasonable matter.

86.    These Defendants, furthermore, breached their duties of care owed to E.spire by their sustained and systematic failure to exercise oversight of the Company's accounting and reporting practices and its officers and employees responsible for such practices.

26

87.    By reason of the above, the Trustee, on behalf of the Estate and the Debtor's creditors is entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $100 million.

## SECOND CLAIM FOR RELIEF

**Breach of Fiduciary Duty of Care owed to creditors in the zone of insolvency against Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks**

88.    The Trustee repeats and incorporates by reference the allegations contained in the preceding paragraphs as if set forth herein.

89.    The Debtor was insolvent at all relevant points described herein and as such owed direct fiduciary duties to its creditors under Delaware law.

90.    These Defendants breached their fiduciary duty of care owed to E.spire's creditors to exercise and to discharge their duties in a reasonable and prudent manner.  By failing to institute basic internal controls, by failing to oversee basic business operations such as billing customers, by failing to keep accounting records in a prudent or organized manner and by allowing the Company to operate in freefalling chaos, these officers/ directors failed to discharge their executive duties in a reasonable matter.

91.    These Defendants, furthermore, breached their duties of care owed to E.spire's creditors by their sustained and systematic failure to exercise oversight of the Company's accounting and reporting practices and its officers and employees responsible for such practices.

92.    By reason of the above, the Trustee, on behalf of the Estate and the Debtor's creditors is entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $100 million.

## THIRD CLAIM FOR RELIEF

### Fraud against Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks

93.     The Trustee repeats and incorporates by reference the allegations contained in the preceding paragraphs as if set forth herein.

94.     Each of these defendants, issued:  1) representations relating to E.spire's reporting and accounting practices; 2) which were material to E.spire's reporting to its shareholders, creditors, lenders and to its public filings; 3) made falsely with knowledge or recklessness as to their falsity; 4) with the intent of misleading E.spire's shareholders, creditors, lenders and E.spire's innocent decision-makers into relying on them; 5) which were justifiably relied upon by E.spire's shareholders, creditors, lenders, and innocent decision-makers; and 6) which resulted in injury to the shareholders, creditors, lenders and innocent decision-makers proximately caused by the reliance.

95.     By reason of the above, the Trustee, on behalf of the Estate and the Debtor's creditors is entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $100 million.

## FOURTH CLAIM FOR RELIEF

### Contribution against Sean Scarlis, Anthony Pompliano, David Piazza and Bradley Sparks

96.     The Trustee repeats and incorporates by reference the allegations contained in the preceding paragraphs as if set forth herein.

97.     According to the Debtor's Claim Schedule, a total of $2,312,365,173.72 in secured, unsecured, priority and administrative claims have been filed against the Debtor's estate.

98.     The Debtor was unable to satisfy these claims, to the extent that they are valid claims, because of the wrongdoing of the Defendants.  Accordingly, the Trustee seeks that Defendants be responsible under a theory of contribution for the payment of these claims to the extent that they are valid.

WHEREFORE, the Trustee demands that judgment be entered in his favor as follows:

A.     on the first count, in an amount to be determined at trial, but believed to be in excess of $100,000,000;

B.     on the second count, in an amount to be determined at trial, but  believed to be in excess of $100,000,000;

C.     on the third count, in an amount to be determined at trial, but believed to be in excess of $100,000,000;

D.     on the fourth count, in an amount to be determined at trial, but believed to be in excess of $1,000,000,000

together with such other and further relief as the Court may deem just and proper, including, without limitation, the Trustee's and the Committee's attorneys' fees and the costs of this action.

Respectfully submitted,

Dated: June 11, 2004

THE BAYARD FIRM

By: _____
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

-and-

29

STORCH AMINI & MUNVES PC
Bijan Amini
Avery Samet
Two Grand Central Tower, 25th Floor
New York, NY  10017
(212) 490-4100

 Counsel to GARY SEITZ, Chapter 11
Trustee of E.spire Communications, Inc.